**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**Daniel A. CULVER, Defendant Below, Appellee.**

**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**Richard L. GABRIEL, Defendant Below, Appellee.**

**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**Carlton E. DOUGLASS, Defendant Below, Appellee.**

Supreme Court of Delaware.

Feb. 4, 1972.

**280**

Mason E. Turner, Jr., Daniel A. Durkin, and Martin A. Schagrin, Deputy Attys. Gen., Wilmington, for plaintiff below, appellant.

Bernard Balick, Asst. Public Defender, Wilmington, for Daniel A. Culver and Carlton E. Douglass, defendants below, appellees.

Sidney Balick, Wilmington, for Richard L. Gabriel, defendant below, appellee.

Before WOLCOTT, Chief Justice, CAREY and HERRMANN, Associate Justices:

HERRMANN, Justice:

These appeals by the State have been granted under 10 Del.C. § 9903 permitting the review of important questions of law, after final judgment in criminal cases, for the governance of future cases.

Involved are three cases of unlawful possession of drugs in which the Superior Court granted the defendants' motions for suppression of evidence on the ground of unlawful search and seizure. Final judgments of acquittal were entered upon indication by the State of inability to proceed without the evidence suppressed. The appeals have been consolidated for decision.

We are confronted with basic questions concerning the permissible scope, under the Fourth Amendment, of searches incident to lawful arrests for minor offenses, the arrestees being taken into actual custody.

I.

In the *Douglass* case, the youthful defendant was hitch-hiking interstate with a very young girl companion on U.S. Route 13 near Wilmington. They were arrested by a lone police officer for unlawfully soliciting a ride on the highway, the officer being dissatisfied as to their identification

and destination.[1] The officer "frisked" Douglass for weapons and searched two suit cases standing on the ground beside Douglass. The stated purpose of the search was to ascertain the presence of dangerous weapons preliminary to placing Douglass, his companion, and their luggage in the police car for transport to the nearest magistrate. The officer found a large plastic bag of marijuana in one of the suit cases and, thereupon, arrested the defendant for unlawful possession of dangerous drugs. In the Superior Court, in a pretrial proceeding on the drug charge, the defendant moved to suppress the evidence taken from the suit cases on the ground of unlawful search and seizure. The Superior Court granted the motion, stating:

> "In the case at hand, there is no question that Officer Testa confronted the defendant and made an arrest properly. This, however, was for a minor violation, that is, hitchhiking. However, if we accept Justice Harlan's reasoning in the *Terry* case and his concluding opinion that once the confrontation was justified, the officer's right to take suitable measures for his own safety follows automatically; but, the next question is the scope of the measures taken in this case. Officer Testa testified that he had no reason to suspect the defendant of carrying a dangerous weapon nor did he fear for his safety. Therefore, the search of the suitcases in defendant's possession under these circumstances was unreasonable. There was no testimony that they were easily accessible to defendant for purposes of obtaining a weapon. Also, the officer could have taken other precautionary measures by placing the suitcases in the trunk of the police car, and therefore, the intrusion into the private property of the defendant was not necessary."

■ The State contends that it was error for the Superior Court to base the disposition of this search and seizure question upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The State specifically objects to the implication of the Superior Court, based upon *Terry*, that the right of the police officer to search for a dangerous weapon in the instant case was dependent upon the subjective reasons he may have had to suspect that the defendant was carrying a dangerous weapon or the subjective grounds he may have had to fear for his own safety.[2] Insofar as that implication may be read into the Trial Court's ruling we agree with the State's position.

The subjective rule of the *Terry* case is inapplicable in the instant case for the reason that *Terry* dealt with the role of the Fourth Amendment in the confrontation on the street between a suspect and a policeman investigating suspicious circumstances. There, the issue was the right of an officer to "stop and frisk", for a dangerous weapon prior to an arrest.[3] Here, prior to

---

1. It is the prevailing police practice in Delaware to take non-resident hitch-hikers into custody when they are very young, unable to give satisfactory answers as to identification or destination, or otherwise appear to be possible runaways or fugitives. The statistics of the Delaware Department of Public Safety indicate that only a small fraction of hitch-hiking offenses result in arrest; the remainder result in police on-the-spot warnings and reprimands.

2. Admittedly, in each of these cases, the police officer had no special reason to suspect that the arrestee was carrying a weapon, or to fear for his own safety.

3. In concluding its evaluation of the balance to be struck between the right of the police officer to protect himself and the citizen's constitutional right to be free from intrusion and unreasonable search, the Court stated that the proper balance prior to an arrest, in the *Terry* "stop and frisk" situation, must be

   " * * * a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual * * *; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of

the search, an arrest had actually been made and the police officer was arranging to take the defendant and his baggage into actual custody and into the police car for transport to the magistrate. The difference is significant. See Worthy v. United States, 133 U.S.App.D.C. 188, 409 F.2d 1105, 1108–1109 (1968).

Where, as here, a lawful arrest has actually been made, the reasonableness of a protective search for dangerous weapons incident to the arrest is governed by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Under *Chimel*, after an arrest has been made and before the arrestee is taken into actual police custody, the arresting officer may automatically, without regard for subjective reasons to suspect the presence of weapons or to fear for his own safety, search the arrestee and the area "within his immediate control" to assure that the arrestee does not have access to dangerous weapons. In marking the proper extent of a search incident to an arrest, the Court stated in *Chimel*:

" * * * When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter

might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. * * *. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 89 S.Ct. at 2040.

Pedestrian and minor traffic cases, in which the search-incident-to-arrest concept has been applied to various situations in which the arrestee is being taken into actual police custody, include Morel v. Superior Court, 10 Cal.App.3d 913, 89 Cal.Rptr. 297 (1970); [4] State v. Moody, Mo., 443 S. W.2d 802 (1969); State v. Henneke, 78 Wash.2d 147, 470 P.2d 176 (1970); [5] Pugh v. Superior Court, 12 Cal.App.3d 1184, 91 Cal.Rptr. 168 (1970); [6] Gustafson v. State, Fla.App., 243 So.2d 615 (1971). [7]

others was in danger. * * *. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. * * *." 88 S.Ct. at 1883.

4. "The officer assumes new duties when the arrestee is placed in the police vehicle and the officer has new actions to perform. The officer must prevent escape; he is responsible for the safety of the arrestee; he must attend to driving and cannot give complete attention to the person under his custody; and even if he is relieved from certain other duties while transporting the arrestee, the officer may come upon events in the apprehension of criminals or in other emergencies which require action on his part." 89 Cal.Rptr. at 300.

5. "The officers had lawfully placed the defendant under arrest. They were about to place him in their police car. As a matter of self protection, the better part of wisdom, and within the limits of their constitutional rights as well as the defendant's, the officers were entitled to conduct a cursory and limited type search for possible weapons such as was here undertaken. To hold otherwise would be to ignore the fact that not infrequently police officers have been assaulted and even killed in the course of carrying out a valid arrest for a minor offense, when the individual involved, unbeknown to the officers, happened to be armed and dangerous." 470 P.2d at 179.

6. "It is now settled that when an officer has taken an alleged traffic offender into custody and is duty-bound to transport him either to a magistrate or to some place of detention, the officer may con-

The defendant contends, however, that the search of the suit cases in the instant case may not be justified under *Chimel* because there was no evidence of the offense of hitch-hiking in danger of being destroyed, and because the defendant did not have easy and quick access to the contents of the closed suit cases, and any dangerous weapon therein, at the time of the arrest. The defendant contends that the police officer could have handcuffed the defendant or could have otherwise kept him at a sufficient distance from the suit cases standing on the roadside as to make it impossible for him to reach into them for a weapon. The fallacy of these arguments is that they measure the justification and reasonableness of the search as of the moment of arrest only; they fail to give due consideration to the necessities and realities of the entire period of custody from the time of arrest to the time of delivery of the defendant, his companion, and their luggage to the magistrate.

In the instant case, it must be assumed that the suit cases would necessarily be in the area of the defendant's "immediate control", as defined in *Chimel*, at some point of time between arrest and delivery to the magistrate—either during the arrest process itself, or during the loading of the luggage into the police car, or during the travel to destination, or during the unloading of the luggage from the police car at destination. To assume otherwise is to assume that the police officer would act as porter for the luggage, into and out of the police car, and into and out of the magistrate court; and that the police car would be so constructed and equipped as to assure that the luggage would be carried outside the passenger area of the vehicle and thus be separated from the defendant. Such assumptions would ignore the realities and practicalities of the situation and, in our opinion, would be quite unreasonable.

We are of the opinion, therefore, that a logical extension of the *Chimel* rule made the suit cases in the instant case an area within the arrestee's "immediate control" subject to a proper protective search for weapons without regard for subjective suspicions or fears. The "exigencies of the situation made that course imperative." Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

We conclude that there was ample justification for the protective search of the two suit cases after the arrest was made and before the defendant and the suit cases were taken into the police car; that, therefore, the search was reasonable and within the permissible scope of a protective search incident to an arrest under the Fourth Amendment. Compare United States v. Mehciz (9 Cir.) 437 F.2d 145 (1971), cert. den. 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed. 2d 139 (1971).

We are of the opinion that the evidence should not have been suppressed.

---

duct a thorough search of the arrestee's person for the purpose of protecting the arresting officer from harm and of preventing disposition of contraband during transportation. * * *.

"While we recognize that there is California authority to the effect that a valid arrest for a traffic offense does not justify a complete search of the arrestee's person * * * but merely a limited search [patdown or 'frisk'] for weapons * * *, the limited search doctrine governs only those cases wherein the traffic violator is merely detained for the purpose of being issued a citation, not those situations wherein he is arrested and taken into custody." 91 Cal.Rptr. at 171.

7. " * * * even if there is no reasonable cause to believe the suspect is armed, when he is taken into custody the officer has a right to search for any hidden weapon which could be used against him to effect escape. * * *

*    *    *    *    *

"When the officer determined to arrest appellant and to place him in the squad car to be taken to the police station, he had a right to conduct a custodial search of appellant's person for his own protection and to prevent escape. An officer cannot be expected to place a suspect in the rear seat of his squad car without first searching him for weapons which might be used against him en route to the station house." 243 So.2d at 624–625.

## II.

In the *Culver* case, the youthful defendant was hitch-hiking interstate on U.S. Route 13 near Wilmington. He was arrested for unlawfully soliciting a ride, being unable to furnish satisfactory information as to age, identity, and destination. On the roadside were a knapsack and a bedroll. The police officer frisked the arrestee, and then "glanced" through the bedroll and knapsack in a cursory manner, the stated purpose being to ascertain the presence of weapons preliminary to putting the defendant, bedroll, and knapsack into the police car for transport to the nearest magistrate. In the process, the arrestee covertly took a small bag from the knapsack and was attempting to dump the contents to the ground when the officer noticed the defendant's activity, discovered the marijuana, and proceeded to arrest the defendant for unlawful possession of drugs. Upon motion to suppress the evidence on the drug charge, the Superior Court granted the motion on the basis of that Court's prior ruling in the *Douglass* case, *supra*.

Applying the *Chimel* rule as herein extended, disagreement with the result reached by the Superior Court must follow. For the reasons stated, it is clear that the knapsack would necessarily be an area within the arrestee's "immediate control", from which he might have obtained a dangerous weapon, at some time during the period of custody and transport by the arresting officer. It follows that the search was justified and within the permissible scope of a search incident to an arrest under the Fourth Amendment.

We are of the opinion that the evidence should not have been suppressed.

## III.

In the *Gabriel* case, the defendant and two companions were arrested by two police officers on U.S. Route 13 near Wilmington at approximately 5:30 a. m., for the offense of walking on the highway at night without a light. The officers were not satisfied, under the circumstances, with information furnished as to origin or destination. One of the officers conducted a "pat-down" search of each of the three to discover the presence of any dangerous weapon. Preliminary to taking the three into custody and placing them and their luggage into the police car for transport to the magistrate, one of the officers searched a bedroll and laundry bag, closed by a draw string, belonging to the defendant. Seeking to ascertain the presence of weapons, the officer squeezed the bag and felt "two objects that were hard and more or less unidentifiable." Thereupon, the officer opened the bag and discovered at its top an open paper bag containing a mixture appearing to be a drug. The defendant was then arrested for unlawful possession of drugs. The officer thereupon proceeded to search the laundry bag further and discovered in a shaving kit a tin-foil container of hashish. Upon motion to suppress the evidence on the drug charge, the Superior Court granted the motion on the basis of its prior ruling in the *Douglass* case, *supra*.

We must disagree with the rationale and the result of the Superior Court in this case. Having made the arrest for walking on the highway, the police officer was entitled under the *Chimel* rule, as herein extended, to search for weapons in the area within the arrestee's "immediate control". For the reasons stated, it must be assumed that the laundry bag would necessarily be within that category at some time during the period of custody and transport to the magistrate by the arresting officers. Having thereafter discovered the open paper bag and made the arrest for possession of drugs upon the basis of the contents thereof,[8] the officer was then entitled, under *Chimel*, to proceed with a fur-

---

8. See Coolidge v. New Hampshire, 403 U.S. 443, 467–468, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971) for discussion of "plain view" doctrine.

ther search of the larger bag and the shaving kit for other evidence of the drug offense which the arrestee might attempt to destroy.

Accordingly, we conclude that both the initial search for weapons and the subsequent search for evidence were amply justified and, therefore, within the scope of a permissible search incident to the arrest under the Fourth Amendment.

We are of the opinion that the evidence should not have been suppressed.

\* \* \*

 We are satisfied that the arrests in these cases were made in good faith, and were not pretextual for the real purpose of searching for drugs, as is implied by the defendants. In none of these cases was the lawfulness of the arrest challenged. There is no evidence that any of the arrests here involved were pretextual. The general rule, permitting search and seizure incident to an arrest, is subject of course to the exception that "an arrest may not be used as a pretext to search for evidence \* \* \*." United States v. Lefkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). But there is no basis in these cases for invocation of that exception. See State v. Moody, Mo., 443 S.W.2d 802 (1969); State v. Anonymous, 6 Conn.Cir. 583, 280 A.2d 816 (1971).

\* \* \* \* \* \*

Although the *Terry* case has not been found to be directly apposite, we take the occasion to endorse the following statement of the United States Supreme Court contained therein:

"\* \* \*. We are \* \* \* concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it

would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence \* \* \*." 88 S.Ct. at 1881.

Those views are even more meaningful now in 1972, than in 1968 when they were uttered.